# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
This is a Class Action by Plaintiffs. Named Plaintiffs are:
Thomas Levien; and James Westhead

### DEFENDANTS
17 Defendants. See attachment.

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Great Britain
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attachment

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☒ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Matters
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Diversity Class Action Suit, 28 U.S.C. s. 1332
Brief description of cause:
fraud/misrep. claims by 2 Plaintiffs & proposed Class of shareholders v. Defendant entities, officers, and directors

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   In excess of $5 million

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   07/25/2019

SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

### FOR OFFICE USE ONLY
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Page 1 of 2

**ATTACHMENT, CIVIL COVER SHEET**
*Thomas Levien, et al. v. hibu plc, et al.*  **(Class Action by Plaintiffs)**

**I.(c)**   **Plaintiffs' Attorneys**

| | |
|---|---|
| Clifford E. Haines | Aaron J. Freiwald |
| Danielle M. Weiss | Zachary S. Feinberg |
| Linda J. Karpel | Freiwald Law P.C. |
| Haines & Associates | 1500 Walnut Street |
| The Widener Building | 18th Floor |
| 1339 Chestnut Street, 5th Floor | Philadelphia, PA 19102 |
| Philadelphia, PA 19107 | Tel. (215) 875-8000 |
| Tel. (215) 246-2200 | |

**I.**   **Listing of the 17 Defendants (in the order in which they appear in caption)**

hibu plc
hibu Group Limited
hibu (UK) Limited
YH Limited
hibu Inc.
hibu (USA) LLC
hibu Holdings (USA) Inc.
hibu of Pennsylvania, Inc.
Estate of John Michael Pocock
Antony Jeffrey Bates
Robert Charles Michael Wigley
Elizabeth Grace Chambers
John Bernard Coghlan
Toby Rufus Coppel
Carlos Espinosa de los Monteros
Estate of Kathleen Flaherty
Richard Hooper

**Attorneys of Defendants:**  are not known

**III.**   **Re: Citizenship of the 17 Defendants**

**3 Defendants are citizens of another state:**

(The Estate of John Michael Pocock
Elizabeth Grace Summers
The Estate of Kathleen Flaherty)

## ATTACHMENT, CIVIL COVER SHEET
### *Thomas Levien, et al. v. hibu plc, et al.*

**III.**   <u>**Citizenship of Defendants (continued)**</u>

**10 Defendants are citizens of a foreign country:**

**(Individuals**

Antony Jeffrey Bates
Robert Charles Michael Wigley
John Bernard Coghlan
Toby Rufus Coppel
Carlos Espinosa de los Monteros
Richard Hooper

**Entities**

hibu plc
hibu Group Limited
hibu (UK) Limited
YH Limited)

**1 Defendant incorporated *or* principal place of business in this State:**

(hibu of Pennsylvania, Inc.)

**3 Defendants incorporated *and* principal place of business in another state:**

(hibu Inc.
hibu (USA) LLC
hibu Holdings (USA) Inc.)

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: First named Plaintiff: Thomas Levien, 717 S. Columbus Blvd. #1417, Phila., PA 19147

Address of Defendant: First named Defendant: hibu plc, One Reading Central, Forbury Rd., Reading, Berkshire, England RG1 3YL

Place of Accident, Incident or Transaction: Fraudulent and/or negligent misreps. made in U.K. and U.S., and received in U.K., U.S. and other countries

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 07/25/2019 _____ *Attorney-at-Law / Pro Se Plaintiff* _____ 09882 _____
*Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☑ 9. All other Diversity Cases
  *(Please specify):* class action by Pls. asserting fraud, misrep.

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Clifford E. Haines , counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 07/25/2019 _____ *Attorney-at-Law / Pro Se Plaintiff* _____ Pa. I.D. No. 09882
*Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Thomas Levien, et al.,                          CIVIL ACTION

        v.

Tribu plc, et al.                                NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                             ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                               (✓)

(f) Standard Management – Cases that do not fall into any one of the other tracks.            ( )

July 29, 2019       CLIFFORD E. HAINES        Plaintiffs
**Date**              **Attorney-at-law**        **Attorney for**

(215) 246-2200   (215) 246-2211   chaines@haines-law.com
**Telephone**        **FAX Number**           **E-Mail Address**

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS LEVIEN, Individually and on   :
Behalf of all others similarly situated,   :
717 S. Columbus Blvd. Apt. 1417   :
Philadelphia, PA 19147;   :
  :
     and   :
  :
JAMES WESTHEAD, Individually and on   :
Behalf of all others similarly situated   :
7 Wellands Green, Cleckheaton   :
West Yorkshire, England BD19 6AW,   :
  :
     Plaintiffs,   :
  :
    v.   :
  :
HIBU PLC   :
One Reading Central, Forbury Road   :
Reading, Berkshire, England RG1 3YL;   :
  :
     and   :
  :
HIBU GROUP LIMITED   :
3 Forbury Place, Forbury Road   :
Reading, Berkshire, England RG1 3YL;   :
  :
     and   :
  :
HIBU (UK) LIMITED   :
3 Forbury Place, Forbury Road   :
Reading, Berkshire, England RG1 3YL;   :
  :
     and   :
  :
YH LIMITED   :
3 Forbury Place, Forbury Road   :
Reading, Berkshire, England RG1 3YL;   :
  :
     and   :
  :
  :

**COMPLAINT - - CLASS ACTION**

Case No.

*Jury trial demanded*

HIBU INC.                                        :
2201 Renaissance Blvd.                           :
King of Prussia, PA 19046;                       :
                                                 :
              and                                :
                                                 :
HIBU (USA) LLC                                   :
2201 Renaissance Blvd.                           :
King of Prussia, PA 19046;                       :
                                                 :
              and                                :
                                                 :
HIBU HOLDINGS (USA) INC.                         :
2201 Renaissance Blvd.                           :
King of Prussia, PA 19046;                       :
                                                 :
              and                                :
                                                 :
HIBU OF PENNSYLVANIA, INC.                       :
2201 Renaissance Blvd.                           :
King of Prussia, PA 19046;                       :
                                                 :
              and                                :
                                                 :
ESTATE OF JOHN MICHAEL POCOCK                    :
5100 Brookview Drive                             :
Dallas, TX 75220;                                :
                                                 :
              and                                :
                                                 :
ANTONY JEFFREY BATES                             :
c/o Immarsat plc                                 :
99 City Road                                     :
London, England EC1Y 1AX;                        :
                                                 :
              and                                :
                                                 :
ROBERT CHARLES MICHAEL                           :
WIGLEY                                           :
Hermitage Farm                                   :
Chidden, Hampshire                               :
United Kingdom PO7 4TD;                          :
                                                 :
              and                                :
                                                 :

2

ELIZABETH GRACE CHAMBERS         :
2121 N. Frontage Road West       :
Unit 211                         :
Vail, CO 81657-4957 ;            :
                                 :
           and                   :
                                 :
JOHN BERNARD COGHLAN             :
c/o O.C.S. Group Limited         :
4 Tilgate Forest Business Park   :
Brighton Road                    :
Crawley, West Sussex             :
England RH11 9BP;                :
                                 :
           and                   :
                                 :
TOBY RUFUS COPPEL                :
3 Downshire Hill                 :
London, England NW3 1NR;         :
                                 :
           and                   :
                                 :
CARLOS ESPINOSA de los           :
MONTEROS                         :
Camino Sur 54                    :
Alcobendas, Spain 28109;         :
                                 :
           and                   :
                                 :
ESTATE OF KATHLEEN FLAHERTY      :
155-60th Street                  :
Avalon, New Jersey 08202-1212;   :
                                 :
           and                   :
                                 :
RICHARD HOOPER;                  :
Broadband Stakeholder Group      :
c/o tech UK                      :
10 St. Bride Street              :
London, England EC4A 4AD,        :
                                 :
              Defendants.        :

Plaintiffs Thomas Levien and James Westhead, on behalf of each of them separately, as well as on behalf of all other shareholders similarly situated, allege the following, based upon personal knowledge and upon information and belief, as to which allegations Plaintiffs believe substantial evidentiary support exists or will exist after reasonable opportunity for discovery:

## NATURE OF THE ACTION

This is a lawsuit brought on behalf of certain persons holding shares as of July 25, 2013 in a British corporation originally known as Yell Group plc, and later renamed hibu plc. Yell Group plc ("Yell Group") owned a publication known as the Yellowbook, a print and online advertising publication for medium and small businesses, which for many years was published in the United States, the United Kingdom, Spain, and Latin America. The business was spun off from British Telecommunications in 2001, sold in 2002 to an investor group, and, as of 2003, conducted business as a publicly traded company known as Yell Group plc, with a market capitalization at one point of more than £5 billion.

In 2012, Yell Group was renamed hibu plc and was deeply in debt.  The officers and Board of Directors conducted a campaign of disinformation and knowing false statements about the company's financial well-being and future prospects that culminated, from the shareholders' perspective, in the delisting of the company's traded shares on or about July 25, 2013, effectively reducing the value of the shareholders' investments to zero.  The Yell/hibu shareholders, including Plaintiffs Levien and Westhead, and all other similarly situated shareholders, reasonably relied on the fraudulent and deceitful misrepresentations and omissions by the company officers and directors and were therefore deprived of the right to make decisions regarding the holding or selling of their stock based on accurate information.

The conspiracy culminated when, in secret cooperation with its lenders, the company effectively divested itself of assets so as to qualify for "administration" (the British analogue to Chapter 11 bankruptcy) and extinguished the rights of all of its shareholders, with no compensation.  In administration, hibu was re-created as a private company, hibu Group Limited, now owned, on information and belief, by former lenders to the company.  As a result of the fraud by the Yell/hibu officers and directors, shareholders, including Plaintiffs Levien and Westhead, and all other similarly situated shareholders, each were deprived of the opportunity to sell their shares prior to the company's extinguishing of their rights, and suffered losses when those shares became worthless.

## THE PARTIES

1.      Plaintiff Thomas Levien is a citizen of Pennsylvania, who is located at 717 S. Columbus Blvd., Apt. 1417, Philadelphia, PA. 19147.

2.      Plaintiff Levien is the son of the founder of Yellow Book in the U.S., a predecessor to Yell/hibu.  Mr. Levien was also the owner of Yellow Book of Pennsylvania, which was acquired by Yell/hibu and became part of Yell/hibu's U.S. subsidiary.

3.      During the relevant time period, Plaintiff Levien was a shareholder of Yell/hibu and suffered loss as a result of the fraud and deceit of the officers and directors of Yell/hibu.

4.      Plaintiff James Westhead is a citizen of the United Kingdom who resides at 7 Wellands Green, Cleckheaton, West Yorkshire, England BD19 6AW.  At all relevant times, Mr. Westhead was a shareholder of Yell/hibu, who also suffered loss as a result of the wrongful conduct of the officers and directors of Yell/hibu.

5.      In addition to being an individual investor in hibu, Plaintiff Westhead is director of hibu Shareholders Grouping Limited ("Shareholders Grouping"), an unincorporated action

5

group of approximately 450 subscribed members, each of whom held shares on the relevant date and suffered losses as a result of Defendants' wrongful conduct.  The Shareholders Grouping, organized and created under the laws of the United Kingdom, is located at Dalton House, 60 Windsor Avenue, London England SW19 2RR.

6.      Each member of the Shareholders Grouping held a relatively modest number of shares, but the total number of shares held by the members of the Shareholders Grouping amounted to a substantial percentage of the total shares of the company as of July 25, 2013.

7.      The members of the Shareholders Grouping are citizens of the United States, including Pennsylvania, as well as citizens of Spain, England, and countries in Latin America and each is among the members of the Class whose certification Plaintiffs now seek.

8.      Defendant hibu plc, at all relevant times, was a holding company for various subsidiaries located in the United Kingdom, United States,and other foreign countries that were together engaged in the business of, among other things, print and digital classified advertising and business directories.

9.      At all relevant times, hibu plc, formerly known as Yell Group plc, was and/or is an entity organized under the laws of the United Kingdom and was and/or is located at One Reading Central, Forbury Road, Reading, Berkshire, England RG1 3YL.

10.     Although Defendant hibu plc was a holding company for various entities and subsidiaries, the officers and Board of Directors of hibu plc controlled all of the decision-making, operations and finances for each of the various entities and subsidiaries, with the entities and subsidiaries providing revenue upstream to hibu plc.

11.     Defendant hibu Group Limited is the successor corporate entity to hibu plc and is engaged in the business of, among other things, print and digital classified advertising and

business directories.  Defendant hibu Group Limited was and/or is organized under the laws of the United Kingdom and was and/or is located at 3 Forbury Place, Forbury Road, Reading, Berkshire RGI 3YL, England RG1 3YL.

12.     At all relevant times, Defendant hibu (UK) Limited, was one of the entities and/or subsidiaries of hibu plc and, at certain times in 2012 and 2013, held the contracts of employment for the officers and members of the Board of Directors of hibu plc.

13.     At all relevant times, Defendant hibu (UK) Limited was and/or is organized under the laws of the United Kingdom and was and/or is located at 3 Forbury Place, Forbury Road, Reading, Berkshire England RGI 3YL.

14.     At all relevant times, Defendant YH Holdings was one of the entities and/or subsidiaries of hibu plc, was and/or is organized under the laws of the United Kingdom, and was and/or is located at 3 Forbury Place, Forbury Road, Reading, Berkshire England RG1 3YL.

15.     Defendant hibu Inc., formerly known as Yellowbook, Inc., is a corporate entity organized under the laws of Delaware that, at all relevant times, is or was the successor in interest to the U.S. subsidiary of hibu plc (formerly known as Yell Group plc).  Defendant hibu Inc. has substantial operations located at 2201 Renaissance Blvd., King of Prussia, Montgomery County, PA 19046.

16.     At all relevant times, hibu Inc., and its related U.S. entities, amounted to the largest and most successful piece of the business overall.

17.     Defendant hibu (USA) LLC is a corporate entity organized under the laws of Delaware that, at all relevant times, is or was the successor in interest to the U.S. subsidiary of hibu plc (formerly known as Yell Group plc).  Defendant hibu (USA), LLC has substantial operations at 2201 Renaissance Blvd., King of Prussia, Montgomery County, PA 19046.

18.     Defendant hibu Holdings (USA) Inc. is a corporate entity organized under the laws of Delaware that, at all relevant times, is or was successor in interest to the U.S. subsidiary of hibu plc (formerly known as Yell Group, plc).  Defendant hibu Holdings (USA) Inc. has substantial operations located at 2201 Renaissance Blvd., King of Prussia, Montgomery County, PA 19046.

19.     Defendant hibu of Pennsylvania, Inc. is a corporate entity organized under the law of Delaware that, at all relevant times, is or was the successor in interest to the U.S. subsidiary of hibu plc (formerly known as Yell Group plc).  Defendant hibu of Pennsylvania, Inc. has substantial operations located at 2201 Renaissance Blvd., King of Prussia, Montgomery County, PA 19046.

20.     The wrongful conduct that is the basis of this action and that caused the massive losses suffered by the shareholder Plaintiffs was carried out by various officers and directors of hibu plc (formerly known as Yell Group plc).  Upon information and belief, these officers and directors were also officers and directors of the other named hibu entities, as well as other hibu entities not named in this action.  To the extent that they were not designated as such, in reality, they held that status as they controlled the decision-making, operations, and finances of each of those entities.  (Unless a particular hibu entity is referred to specifically, hibu plc and its various predecessors, entities, and subsidiaries will be referred to collectively as "Yell Group," or "hibu" or "the hibu Defendants.")

21.     During the relevant time period, John Michael Pocock was the Chief Executive Officer ("CEO") of Yell Group, which later became hibu plc.  Mr. Pocock was also a member of the Board of Directors of Yell Group (later renamed hibu plc). On information and belief, Mr. Pocock passed away in December 2018.

8

22.     Defendant the Estate of John Michael Pocock is a legal entity that is responsible and legally liable for the claims against John Michael Pocock, deceased.  The situs of the Estate of John Michael Pocock is 5100 Brookview Drive, Dallas, TX 75220.

23.     During the relevant time period, Defendant Antony Jeffrey Bates was the Chief Financial Officer ("CFO") of Yell Group, which later became hibu, plc.  Mr. Bates was also a member of the Board of Directors of Yell Group (later renamed hibu plc). Mr. Bates is a citizen of the United Kingdom and resides at c/o Immarsat plc, 99 City Road, London, England EC1Y 1AX.

24.     During the relevant time period, Robert Charles Michael Wigley was the Chairman of the Board of Directors of Yell Group, which later became hibu plc.  Mr. Wigley is a citizen of the United Kingdom and resides at Hermitage Farm, Chidden, Hampshire, United Kingdom PO7 4TD.

25.     During the relevant time period, Elizabeth Grace Chambers was a member of the Board of Directors of Yell Group, which later became hibu plc.  Ms. Chambers is a citizen of Colorado and resides at 2121 N. Frontage Road West, Unit 211, Vail, CO 81657-4957.

26.     During the relevant time period, John Bernard Coghlan was a member of the Board of Directors of Yell Group, which later became hibu plc.  Mr. Coghlan is a citizen of the United Kingdom and resides at c/o O.C.S. Group Ltd., 4 Tilgate Forest Business Park, Brighton Road, Crawley, West Sussex, England RH1 9BP.

27.     During the relevant time period, Toby Rufus Coppel was a member of the Board of Directors of Yell Group, which later became hibu plc.  Mr. Coppel is a citizen of the United Kingdom and resides at 3 Downshire Hill, London, England NW3 1NR.

9

28.     At all relevant times, Carlos Espinosa de los Monteros was a member of the Board of Directors of Yell Group, which later became hibu plc.  Mr. Espinosa de los Monteros is a citizen of Spain and resides at Camino Sur 54, Alcobendas, Spain 28109.

29.     At all relevant times, Kathleen Ruth Flaherty, deceased, was a member of the Board of Directors of Yell Group, which later became hibu plc.  On information and belief, Ms. Flaherty passed away in August 2018 and her Estate, which is a legal entity that is responsible and legally liable for the claims against her, has a situs of 155-60th Street, Avalon, New Jersey 08202-1212.

30.     At all relevant times, Richard Hooper was a member of the Board of Directors of Yell Group, which later became hibu plc.  Mr. Hooper is a citizen of the United Kingdom who resides at Broadband Stakeholder Group, c/o tech UK, 10 St. Bride Street, London, England EC4A 4AD.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over the claims asserted in this Complaint, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5 million and the conditions in either 29 U.S.C. § 1332(d)(2) (A), (B) or (C) are met.

32.     As required by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) & (6), when the claims of individual Class members are aggregated, the matter in controversy here exceeds the sum of $5 million, exclusive of interests and costs.

33.     When the losses of Plaintiffs Levien and Westhead are considered together with those of the 450 subscribed members of the Shareholders Grouping, those losses well exceed the

$5 million statutory threshold, without even taking into account other, similarly situated but unnamed former shareholders.

34.     At a minimum, the requirements for subject-matter jurisdiction of 28 U.S.C. § 1332(d)(2)(C) are met because any member of the Class of Plaintiffs is a citizen of a State, and any defendant is a citizen or subject of a foreign state.

35.     Plaintiff Levien is a citizen of a state, Pennsylvania.  Individual defendants Bates, Wigley, Coghlan, Coppel, de los Monteros, and Hooper, among others, are each citizens of a foreign state.

36.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred within this judicial district.

37.     Venue is also proper in this Court because several of the Defendants are citizens of a foreign state, and pursuant to 28 U.S.C. § 1391(c)(3), because citizens of a foreign state may be sued in any judicial district.

38.     The requirements of personal jurisdiction are met here because all of the Defendants had substantial and continuous contacts with the Commonwealth of Pennsylvania during the relevant time period when the events, actions and omissions giving rise to Plaintiffs' claims took place.

39.     Moreover, upon information and belief, the hibu Defendants did and continue to register for business in the Commonwealth of Pennsylvania; conduct business in the Commonwealth of Pennsylvania; pay taxes to the Commonwealth of Pennsylvania; and/or report to the government or agencies of the Commonwealth of Pennsylvania.

## CLASS ACTION ALLEGATIONS

40.    The previous paragraphs are incorporated by reference as though set forth here in their entirety.

41.    Plaintiffs Levien and Westhead bring this action both individually and as a class action, pursuant to Federal Rule of Civil Procedure 23.

42.    The following class is proposed: All persons who held shares in hibu plc as of July 25, 2013 and suffered financial losses as a result of the Defendants' wrongful and deceitful conduct and actions ("the proposed Class").

43.    Excluded from the proposed Class are any Defendant, as well as the officers and directors of any Defendant, and the immediate families, legal representatives, heirs, successors or assigns of any of them.

44.    Also excluded from the proposed class are any shareholders who were Defendants' lenders and the employees of any lenders.

45.    Plaintiffs Levien and Westhead reserve the right to modify the definition of the proposed Class or to add one or more subclasses, if further investigation, discovery, or rulings by the Court warrant that action.

46.    This action is brought and may be maintained as a class action, since it fulfills the following general requirements of Federal Rule of Civil Procedure 23(a):

(a)    The proposed Class is so numerous that joinder of all members is impracticable.  While the precise size of the proposed Class is unknown, the subscribed members of the Shareholders Grouping – who are members of the proposed Class – alone number 450.  Accordingly, the number of proposed Class members is clearly far greater than can be addressed feasibly through any joinder.  Moreover, the proposed Class

12

members include citizens who are geographically dispersed through the United States, as well as members who are citizens of foreign states, also making joinder impracticable.

(b)     There are questions of law and fact common to the claims of all of the members of the proposed Class, which predominate over any questions solely affecting individual members of the proposed Class.  Defendants' fraudulent conduct was substantially the same with respect to each member of the proposed Class.  The common questions of fact and law include the following:

1.     Did Defendants recklessly accumulate debt such that delisting of the shares of stock held by members of the proposed Class became necessary?

2.     Did Defendants engage in reckless mismanagement of the company, for example, by failing to sell the U.S. subsidiary when there was an opportunity to do so?

3.     Did Defendants engage in a campaign of fraud, misrepresentation, and knowing false statements regarding the company's earnings projections, financial well-being, and commitment to protect the interest of shareholders?

(c)     The claims of Plaintiffs Levien and Westhead are typical of the Class. Plaintiffs Levien and Westhead, as well as the similarly-situated members of the proposed Class, all owned shares of hibu as of July 25, 2013, when the shares were delisted and their value was immediately reduced to zero.  All were similarly affected by, and have suffered similar harm as a result of Defendants' wrongful and deceitful conduct.

(d)     The representative Class Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs Levien and Westhead have no interests antagonistic to, or in conflict with, the interests of the proposed Class. They will fairly and adequately

represent the interests of the proposed Class.  Moreover, they have retained competent counsel and intend to vigorously prosecute this action.

47.    This lawsuit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(1).  Because all members of the proposed Class have been similarly injured by the same fraudulent conduct on the part of Defendants, the prosecution of separate actions by individual members of the proposed Class would create a risk that incompatible standards of conduct would be established for any party opposing the proposed Class. Moreover, since common questions of law or fact predominate over questions solely affecting individual Class members, the prosecution of separate actions by individual members of the proposed Class would also create a risk that the adjudication of such separate actions would be dispositive of the interests of other members not parties to those actions, or impair or impede their ability to protect their interests.

48.    This lawsuit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3).  As set forth previously, questions of law and fact common to all members of the proposed Class predominate over any questions affecting only individual members of the proposed Class.  Moreover, a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because joinder of such a large number of individuals who are members of the proposed Class is not practicable.

49.    To the knowledge of Plaintiffs Levien and Westhead, no other action has been brought on an individual or class basis asserting the fraudulent conduct involved in this Complaint. The disposition of the claims of the proposed Class members in a single action will provide substantial benefits to both the Court and the parties, especially since the damages suffered by many individual members of the proposed Class are likely insufficient to justify the

burden and expense of individual litigation. Moreover, individual litigation could lead to inconsistent and potentially conflicting judgments with respect to the Defendants.

50.     The use of the class action procedure for the claims of all members of the proposed Class likely presents far fewer management difficulties than would individual litigation.  No management difficulties are foreseen and the class action procedure here would serve the interests of judicial efficiency and fairness.

## FACTS

### Yell Group Through 2009

51.     The previous paragraphs are incorporated by reference as though set forth in their entirety here.

52.     In or about 2001, British Telecom restructured.  In doing so, British Telecom spun off, and later sold, one of its divisions, which later became Yell Group, to a consortium of investors.

53.     Yell Group produced and sold advertising directories commonly known as the "Yellow Book."

54.     In or about 2003, Yell Group plc ("Yell Group") became a public company, having been floated on the London Stock Exchange and having attracted more than £2 billion in investment through its first public offering.

55.     Yell Group quickly became one of the FTSE 100, one of the one hundred largest qualifying companies in the United Kingdom, as judged by market value.

56.     From 2005 through 2006, Yell Group expanded by purchasing similar businesses in the United States, including TransWestern Publishing (2005), and, in Spain, about 60 percent

of Spain's Telefónica Publicidad é Informacíon (2006), as well as other smaller directory interests in Chile and Peru.

57.     In early 2007, Yell Group reached its peak market position, with a market cap of approximately £5 billion and a share price of more than 500p.

58.     However, in making its purchases of similar directory businesses, Yell Group spent billions of pounds and incurred large amounts of debt.

59.     Moreover, in attempting to grow its print directory brand by making those acquisitions, Yell Group paid insufficient attention to the explosion in Internet communications then occurring, as well as to the impact of the Internet on print media, including print advertising directories such as the Yellow Book.

60.     Declining revenues, coupled with an international recession beginning in 2008, weighed down Yell Group's growth and put downward pressure on the share prices of the company's stock.

61.     In 2009, Defendant Wigley became chairman of the Board of Directors of Yell Group.

62.     Under Wigley, Yell Group responded to pressure from its lenders by (a) conducting a second public offering; and (b) renegotiating arrangements with its lenders.

63.     Yell Group's refinancing efforts raised about £660 million from shareholders, such that, shortly after its 2009 efforts, Yell Group had a market cap of almost £1 billion. Further, Yell Group was able to reach agreement with its lenders to extend its debt repayment plan to 2014.

**Yell Group From 2010 Through January 2011**

64.     In October 2010, the Board of Directors of Yell Group ("the Yell Board") asked Joseph Walsh, the President and Chief Executive Officer of Yell's U.S. subsidiary, Yellowbook, Inc. (known, after January 18, 2013, as hibu Inc.), to seek a buyer for the American business.

65.     At the time, Yellowbook Inc. was Yell Group's most profitable business, generating about half of Yell Group's revenues.

66.     At no time was the Yell Board's effort, through Mr. Walsh, to solicit buyers for the American business disclosed to Plaintiffs Levien or Westhead, or to other similarly situated shareholders.

67.     Shortly thereafter, Yell Group restructured its primary management team, including, in November 2010, the hiring of an American executive, Defendant Pocock, to be Yell Group's new Chief Executive Officer ("CEO") and Executive Board member.

68.     Defendant Pocock was a putative "turn-around" specialist from the United States, who at one time served as CEO of Polaroid.

69.     Pocock came to Yell Group with no background or experience in the sales, marketing, or operation of advertising directories.

70.     Plaintiffs Levien and Westhead, and the other similarly situated shareholders, were not advised by the Yell Board of the serious decline in Yell Group's business or that the Yell Board was attempting to salvage the business through the hiring of Pocock.

71.     Rather than turning around Yell Group's business, Pocock and the Yell Board engaged in conduct over the next several years that was not only detrimental to Yell Group's shareholders, including Plaintiffs Levien and Westhead, and other similarly situated shareholders, but also was to the personal benefit of the Yell directors and officers.

17

72.     In or about December 2010, Mr. Walsh reported back to the Yell Board that a consortium was willing to pay at least $1.6 billion for the American business.  Another offer of up to $1.9 billion followed.

73.     Shortly thereafter, in January 2011, Pocock began his duties as Yell Group's CEO and Board Member.

74.     Pocock and the Yell Board  rejected all the offers for the purchase of the American business that Mr. Walsh reported.

75.     Indeed, in early January 2011, the Yell Board advised Walsh that it was no longer interested in locating any buyer for the American Yellowbook business.

76.     The Yell Board's solicitation and subsequent rejection of offers to purchase the American subsidiary were not disclosed.  Again, offers for the American business, as well as the Yell Board's order to cease searching for buyers, were not disclosed to Plaintiffs Levien and Westhead, or other similarly situated shareholders.

77.     Knowledge that the Yell Board was seeking to sell off its American subsidiary – the most profitable part of Yell's business – would have had a material influence on how Plaintiffs conducted themselves in response.

78.     Knowledge that the Yell Board and Pocock had rejected a nearly $2 billion offer to purchase the American subsidiary would have had a material influence on how Plaintiffs evaluated the value of their shares.

**Yell Group/hibu plc in 2012**

79.     On or about July 26, 2012, Pocock announced that Yell Group was abandoning its well-known brand name, in favor of a new nonsensical and inexplicable lower-case name, "hibu," effective July 30, 2012.

18

80.     In the meantime, in order to "turn around" Yell Group's faltering business, Pocock hired a technology consultant team from Booz & Co.

81.     The team from Booz and Co. devised a multi-point, four-year program (the "Transition Strategy") for the business to move away from traditional print advertising, at that time still Yell Group's core business, and focus on providing internet directories and/or other digital services for small businesses and consumers.

82.     On or about July 14, 2011, Yell announced this Transition Strategy to the company, shareholders, lenders, and the public.

83.     The initiatives and projections continued to be communicated to shareholders and lenders through written communications and meetings, many of which were held in the U.S.

84.     Among other things, for example, the Transition Strategy projected that Yell Group's revenue mix, which was 75 percent from print and 25 percent from digital in 2011, should move to 75 percent digital and 25 percent print by 2015.  Forecasts also included projecting significant overall growth in revenue, earnings and cash flow, together with an increase of 1.5 million customers and a £100 million reduction in fixed costs.

85.     None of these lofty projections ever were met.

86.     Almost immediately, senior management in the American subsidiary operations and elsewhere advised Pocock and his team that the Transition Strategy's proposed initiatives were unrealistic and that the projections were baseless.

87.     Despite the input of seasoned Company veterans from the subsidiaries, Pocock insisted on ignoring the counsel of these professionals, who were long-time executives that had been instrumental in Yell Group's early growth.

88.     The Yell Board continued to support Pocock and his Transition Strategy, despite the protests from the American subsidiaries that Pocock's projections were without basis and were unrealistic.

89.     As time went on, Pocock and Defendant Wigley transmitted repeated optimistic reports to the Yell Board, exaggerated claims that progress was being made under the Transition Strategy, and knowingly false statements that while some adjustments in projected revenue needed to be made, the program overall was on target.

90.     Pocock and Defendants continued to communicate false and baseless projections, even though senior management officials warned that projections made pursuant to the transition program were disingenuous and misleading to the lenders and to the shareholders, to the point of being fraudulent.

91.     Plaintiffs Levien and Westhead, as well as similarly situated shareholders, were not timely advised that senior company officials internally were questioning Pocock's projections as baseless and unrealistic.

92.     Despite the inflated projections, Yell Group continued to experience declining revenues through 2011 and into 2012.

93.     However, despite the declining financial health of Yell, on July 20, 2011, in a Regulatory News Service ("RNS") announcement, Defendant Bates, Yell's Chief Financial Officer and Executive Board member, represented that Yell "is cash generative and profitable."

94.     Wigley, Yell Group's Board Chair, also represented that he was "convinced about the strength of the company" when, in a November 15, 2011 RNS, he announced that he himself had purchased Yell Group debt, with a face value of £1 million for about £200,000 (as well as spending £100,000 to make a Yell stock purchase of 2,610,000 shares).

95.     Wigley's purchase of Yell Group debt for profit without a public announcement of the sale of the company's debt was improper.  Moreover, on information and belief, Wigley purchased that Yell debt without prior approval of the Yell Board, a breach of his fiduciary duty to Yell Group.  In addition, Wigley's new status as a Yell Group lender placed him in a position of conflict vis-à-vis his role as Yell Group's Board Chair and chief negotiator with the company's lenders.

96.     Wigley, as Board Chair, and Pocock as Yell's (later, hibu's) CEO and Board member, repeatedly misrepresented and falsely claimed to Yell Group's shareholders, including Plaintiffs Levien and Westhead, and other similarly situated shareholders, that the company was committed to protecting their interests, and that things were looking up, with respect to the company's financial condition.

97.     However, beginning as early as March 2012, the Yell Group was starting to transfer significant assets to subsidiaries and was planning other accounting maneuvers, which would enable the company to go into administration and cause the shareholders to lose the entire value of their shares.

98.     In Yell Group's 2012 Annual Report, released in or about May 2012, Board Chair Wigley represented that the company was focused on the interests of shareholders and was committed to maximizing shareholder value, even as it sought to transform Yell's business:

> The Board is very focused on the fact that shareholders have not seen a positive return since Yell embarked on its transformation.  The share price has been affected by the risks associated with our capital structure and the continued decline of our directories business and it is still too early for the impact of our new strategy to offset these issues.  The Board remains committed to maximizing value for shareholders, many of whom supported the rights issue three years ago, while protecting the interests of all stakeholders as we focus on transforming the business and putting in place a new capital structure.

99.     As of 2009, Yell Group's shares had sold at 42p each, but by the time the 2012 Annual Report was released, the share price had fallen to less than 5p.  Shareholders reasonably relied on Wigley's statement to believe that, from that point in time forward, they would be receiving an appreciable return on their investments.

100.    On or about July 30, 2012, in a published RNS announcement, Wigley stated, among other things, that Yell Group, by then known as hibu, had decided to move proactively to engage with its stakeholders. At that time, Wigley again represented that the company was focusing on protecting its shareholder interests, when he stated that the aim of hibu plc was "to formulate a capital structure which will support the Group's exciting business potential while safeguarding existing shareholder's interests to the fullest extent possible."

101.    In a July 25, 2012 published RNS statement, CEO Pocock likewise represented that the company was still confident in the ability of its four-year program to transform its business. In the same RNS statement, Yell/hibu's directors represented that company forecasts indicated that, in the next twelve months, the company would fully meet its interest payments, with additional cash generated to repay debt.

102.    In addition, in the July 25, 2012 RNS, Pocock falsely promised, that the company would consult with its shareholders about putting in place any change in Yell/hibu's capital structure; according to Pocock, the company "intends to consult with its key stakeholders, including Lenders and shareholders, over the coming months in order to put in place an appropriate Group capital structure within the current financial year."

103.    The Yell Board even represented that its decision to dramatically write down the company's goodwill and intangible assets was not problematic, characterizing it as a "non-cash accounting adjustment," in spite of its potential adverse market effect.

22

104.    In its 2012 Annual Report, the Yell Board announced that it was taking a "one-off" impairment charge of £1.8 billion against company goodwill and intangible assets, leaving the company with a Net Asset Value of about £300 million, as compared to the previous year's figure of £1.5 billion.

105.    In or about August, 2012, a six-member Coordinating Committee was formed to represent the interests of the company's lenders.  The Committee became known as "CoCom."

106.    Rumors had begun to circulate about hibu's ability to meet an upcoming debt payment in October 2012, and hibu was able to negotiate an agreement with the lenders that they would not call an event of default in response to any misrepresentations about hibu's possible nonpayment.

107.    After hibu announced the agreement, the market responded well, with the share price rising by some 20 percent on the date of the announcement.

108.    However, in October 2012, despite the negotiations and favorable response, hibu failed to make its scheduled £49 million payment to its lenders.

109.    Despite hibu's claimed inability to meet this debt service obligation, hibu had nearly £200 million available to make the October 2012 payment.

110.    The representations by hibu's Board and executive officers about the company's commitment to protecting the interests of, and maximizing value for, its shareholders, as well as regarding the strength of the company, were untrue, although hibu's shareholders, including Plaintiffs Levien and Westhead and other similarly situated shareholders, were unaware of that fact until the summer of 2013.

111.     As Defendants continued to make materially false statements and representations about the company's well-being, hibu was divesting itself of major assets and distributing money to subsidiary companies in order to then move the company into administration.

112.     Again, though unknown to Plaintiffs Levien and Westhead, and other similarly situated shareholders, hibu and Defendants were preparing to move the company into administration, a step that would deprive its shareholders of all value in their shares.

113.     The impairment charge described earlier in this Complaint, which wrote down about £1.8 billion of company goodwill and intangible assets, constituted an example.

114.     Moreover, at least one large divestiture of funds from Yell/hibu to a wholly-owned subsidiary also occurred during this time frame.

115.     In or about March 2012, Yell divested itself of over £1.065 billion in cash, by transferring it to a non-trading subsidiary, Yell Finance BV.

116.     These two drastic and detrimental measures were taken without any consultation with, prior notice to, or explanation provided to the company's shareholders, including Plaintiffs Levien and Westhead, and other, similarly situated shareholders.

**Hibu in 2013**

117.     hibu plc's annual audited financial figures were due to be completed by March 31, 2013, so that its 2013 Annual Report could be issued in or about May 2013, but these events did not occur as scheduled.

118.     On or about July 25, 2013, about the time when the company's Annual General Meeting would have been held if the 2013 Annual Report had been timely prepared, the hibu Board issued its own version of the company's financial figures, without the prior approval of the company's auditors.

119.     Those figures showed another dramatic impairment charge of £2 billion that was applied to goodwill and intangible assets by the company in March 2013.

120.     Again, Defendants provided no consultation, notice or explanation to Plaintiffs Levien and Westhead, or to any other similarly situated shareholders.

121.     On or about October 9, 2013, the hibu Board issued a further financial update, suggesting that, since July 2013, a third impairment charge of £39 million had been applied against goodwill and intangible assets.

122.     Thus, in about a year and a half, the hibu Board had written down a total of more than £3.5 billion in goodwill and intangible assets, with no prior or subsequent explanation having been provided to Plaintiffs Levien and Westhead or to any other similarly situated shareholders.

123.     Even more important, on July 25, 2013, the directors suspended trading of the company's stock on the London Stock Exchange and declared the stock to be worthless. They announced that the company had reached an agreement with CoCom on a restructuring of hibu, involving a partial debt for equity swap.

124.     More specifically, CoCom had apparently agreed to write off £800 million of the total £2.3 billion of debt owed by hibu, in return for gaining control of the company and eliminating the interest of shareholders.

125.     In making this announcement, the hibu Board did not hold a meeting and did not face shareholders and answer questions. A sketchy public statement from hibu's Board was all that was provided.

126.     On or about November 6, 2013, certain shareholders called for an extraordinary general meeting ("EGM").

127.    Board Chair Wigley responded in a circular to shareholders, advising that, if a material number of the new directors proposed by the shareholders were appointed at the EGM, the company expected to place itself into administration, at which point the directors would cease to have any authority to control hibu or prevent the planned restructuring.

128.    One week before the EGM, on November 27, 2013, the hibu Board carried out its threat and placed hibu in administration.

129.    No officers or directors attended the EGM.

130.    Defendant hibu came out of administration as a private company, hibu Group Limited, controlled by the lenders.

131.    Plaintiffs Levien and Westhead, as well as all similarly situated shareholders, each lost vast sums because of Defendants' wrongful and deceitful conduct.

## CAUSES OF ACTION

### Count One: Deceit (Under British Common Law)
### Proposed Class Plaintiffs v. All Defendants

132.    The previous paragraphs are incorporated by reference as though set forth in their entirety.

133.    Defendants made numerous false statements to the Plaintiffs, including:

a.      Stating that Defendant Pocock was qualified to serve as Yell Group's CEO;

b.      Stating baseless and unrealistic financial projections for Yell Group's new digital business on July 14, 2011;

c.      Stating in Yell Group's 2012 Annual Report, released in or about May 2012 that the company was focused on the interests of shareholders and was committed to maximizing shareholder value;

d.      Stating their confidence that the company was in a position of strength on November 15, 2011;

e.      Stating and/or impliedly stating that Defendant Wigley was not acting in a conflict of interest after he purchased Yell Group debt with a face value of £1 million for about £200,000, a step announced in a November 15, 2011 RNS;

f.      Stating and/or impliedly stating that Yell/hibu's directors and officers were acting without any conflicts of interests;

g.      Stating on July 25, 2012 that the company would be able to fully meet its interest payments and generate sufficient cash to repay its debts;

h.      Stating on July 25, 2012 that it was the company's intent to consult with its shareholders regarding the company's capital structure despite having already reduced the company's assets by £2 billion in the prior months;

i.      Stating on or about July 30, 2012, in a published RNS announcement, that the aim of hibu plc was to safeguard the existing shareholders' interests;

j.      Stating in the 2012 Annual Report that the company was taking a "one-off" impairment charge against the company's goodwill when the company was actually planning further significant change to its capital structure;

k.      Stating that the company would protect shareholder interests when the company had already formulated a plan to move the company into administration; and

l.      Stating that the company would protect shareholder interests when the company was planning to protect its lenders with priority over the shareholders.

134.    The false, misleading, and deceitful statements referenced above are imputed to all Defendants because Pocock and Wigley and others acted as agents for the Yell/hibu Board of Directors and the Defendants did not take any action to disavow or correct the statements made by Pocock, Wigley, and others at Yell/hibu.

135.    The statements referenced above are imputed to all Defendants because the Yell/hibu officers and directors held fiduciary duties to disavow and/or correct the false, misleading, and deceitful statements made by Pocock, Wigley, and others at Yell/hibu.

136. Defendants knew or should have known that these statements were false, misleading, and deceitful.

137. Defendants made these false, misleading, and deceitful statements for the purpose of inducing Plaintiffs to maintain and/or increase their shareholder status in Yell/hibu.

138. Plaintiffs, reasonably relying on Defendants' false, misleading, and deceitful statements, were, in fact, induced into maintaining and/or increasing their status as shareholders in Yell/hibu.

139. As a result of Defendants' false statements, Plaintiffs suffered financial harm, including the complete devaluing of their shares.

WHEREFORE, Plaintiffs Levien and Westhead, on behalf of themselves and other similarly situated shareholders, all of whom are members of the proposed Class, demand that judgment on Count One be entered against the Defendants, jointly and severally, in favor of Plaintiffs for their actual, special, compensatory, and punitive damages, along with reasonable attorneys' fees and costs and any other relief that this Court deems just and proper.

**Count Two: Fraudulent Misrepresentation**
**Section 2(1) of the British Misrepresentation Act of 1967**
**Proposed Class Plaintiffs v. All Defendants**

140. The previous paragraphs are incorporated by reference as though set forth in their entirety.

141. Defendants made numerous misrepresentations to the Plaintiffs, including:

    a.    Stating that Defendant Pocock was qualified to serve as Yell Group's CEO;

    b.    Stating baseless and unrealistic financial projections for Yell Group's new digital business on July 14, 2011;

c.   Stating in Yell Group's 2012 Annual Report, released in or about May 2012 that the company was focused on the interests of shareholders and was committed to maximizing shareholder value;

d.   Stating their confidence that the company was in a position of strength on November 15, 2011;

e.   Stating and/or impliedly stating that Defendant Wigley was not acting in a conflict of interest after he purchased Yell Group debt with a face value of £1 million for about £200,000, a step announced in a November 15, 2011 RNS;

f.   Stating and/or impliedly stating that Yell/hibu's directors and officers were acting without any conflicts of interests;

g.   Stating on July 25, 2012 that the company would be able to fully meet its interest payments and generate sufficient cash to repay its debts;

h.   Stating on July 25, 2012 that it was the company's intent to consult with its shareholders regarding the company's capital structure despite having already reduced the company's assets by £2 billion in the prior months;

i.   Stating on or about July 30, 2012, in a published RNS announcement, that the aim of hibu plc was to safeguard the existing shareholders' interests;

j.   Stating in the 2012 Annual Report that the company was taking a "one-off" impairment charge against the company's goodwill when the company was actually planning further significant change to its capital structure;

k.   Stating that the company would protect shareholder interests when the company had already formulated a plan to move the company into administration; and

l.   Stating that the company would protect shareholder interests when the company was planning to protect its lenders with priority over the shareholders.

142.   The false, misleading, and deceitful statements referenced above are imputed to all Defendants because Pocock and Wigley and others acted as agents for the Yell/hibu Board of Directors and the Defendants did not take any action to disavow or correct the statements made by Pocock, Wigley, and others at Yell/hibu.

143.    The false, misleading, and deceitful statements referenced above are imputed to all Defendants because the Yell/hibu officers and directors held fiduciary duties to disavow and/or correct the statements made by Pocock, Wigley, and others at Yell/hibu.

144.    Defendants knew or should have known that these statements were false, misleading, and deceitful. Further, Defendants did not have reasonable grounds to believe the truth of these statements.

145.    Defendants made these false, misleading, and deceitful statements for the purpose of inducing Plaintiffs to maintain and/or increase their shareholder status in Yell/hibu.

146.    Plaintiffs, relying on Defendants' false, misleading, and deceitful statements, were, in fact, induced into maintaining and/or increasing their status as a shareholder in Yell/hibu.

147.    As a result of Defendants' false, misleading, and deceitful statements, Plaintiffs suffered financial harm, including the complete devaluing of their shares.

WHEREFORE, Plaintiffs Levien and Westhead, on behalf of themselves and other similarly situated shareholders, all of whom are members of the proposed Class, demand that judgment on Count Two be entered against the Defendants, jointly and severally, in favor of Plaintiffs for their actual, special, compensatory, and punitive damages, along with reasonable attorneys' fees and costs and any other relief which this Court deems just and proper.

### Count Three: Negligent Misstatements (British Common Law)
### Proposed Class Plaintiffs v. All Defendants

148.    The previous paragraphs are incorporated by reference as though set forth in their entirety.

149.   Defendants, by virtue of the fiduciary duties imposed upon directors and officers of a corporation, owed the shareholders of Yell/hibu a duty to not make false, misleading, and deceitful statements.

150.   Defendants made numerous false, misleading, and deceitful statements to the Plaintiffs, including:

a.   Stating that Defendant Pocock was qualified to serve as Yell Group's CEO;

b.   Stating baseless and unrealistic financial projections for Yell Group's new digital business on July 14, 2011;

c.   Stating in Yell Group's 2012 Annual Report, released in or about May 2012 that the company was focused on the interests of shareholders and was committed to maximizing shareholder value;

d.   Stating their confidence that the company was in a position of strength on November 15, 2011;

e.   Stating and/or impliedly stating that Defendant Wigley was not acting in a conflict of interest after he purchased Yell Group debt with a face value of £1 million for about £200,000, a step announced in a November 15, 2011 RNS;

f.   Stating and/or impliedly stating that Yell/hibu's directors and officers were acting without any conflicts of interests;

g.   Stating on July 25, 2012 that the company would be able to fully meet its interest payments and generate sufficient cash to repay its debts;

h.   Stating on July 25, 2012 that it was the company's intent to consult with its shareholders regarding the company's capital structure despite having already reduced the company's assets by £2 billion in the prior months;

i.   Stating on or about July 30, 2012, in a published RNS announcement, that the aim of hibu plc was to safeguard the existing shareholders' interests;

j.   Stating in the 2012 Annual Report that the company was taking a "one-off" impairment charge against the company's goodwill when the company was actually planning further significant change to its capital structure;

31

k.    Stating that the company would protect shareholder interests when the company had already formulated a plan to move the company into administration; and

l.    Stating that the company would protect shareholder interests when the company was planning to protect its lenders with priority over the shareholders.

151.    The false, misleading, and deceitful statements referenced above are imputed to all Defendants because Pocock and Wigley and others acted as agents for the Yell/hibu Board of Directors and the Defendants did not take any action to disavow or correct the statements made by Pocock, Wigley, and others at Yell/hibu.

152.    The false, misleading, and deceitful statements referenced above are imputed to all Defendants because the Yell/hibu officers and directors held fiduciary duties to disavow and/or correct the statements made by Pocock, Wigley, and others at Yell/hibu.

153.    Defendants knew or should have known that these statements were false, misleading, and deceitful, *i.e.*, that they were misrepresentations. Further, Defendants did not have reasonable grounds to believe the truth of these statements.

154.    Defendants made these false, misleading, and deceitful statements for the purpose of inducing Plaintiffs to maintain and/or increase their shareholder status in Yell/hibu.

155.    Plaintiffs, relying on Defendants' misrepresentations, were, in fact, induced into maintaining and/or increasing their status as a shareholder in Yell/hibu.

156.    As a result of Defendants' false statements and misrepresentations, Plaintiffs suffered financial harm, including the complete devaluing of the shares.

WHEREFORE, Plaintiffs Levien and Westhead, on behalf of themselves and other similarly situated shareholders, all of whom are members of the proposed Class, demand that judgment on Count Three be entered against the Defendants, jointly and severally, in favor of

Plaintiffs for their actual, special, compensatory, and punitive damages, along with reasonable attorneys' fees and costs and any other relief which this Court deems just and proper.

WHEREFORE, Plaintiffs Levien and Westhead, on behalf of themselves and other similarly situated shareholders, all of whom are members of the proposed Class, seek certification of the proposed Class and that judgment be entered on their behalf as to the claims described above.

[Space intentionally left blank]

Respectfully submitted:

**HAINES & ASSOCIATES**

Dated: July 25, 2019

By: _____
CLIFFORD E. HAINES (I.D. No. 09882)
DANIELLE M. WEISS (I.D. No. 201067)
LINDA J. KARPEL (I.D. No. 62009)
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
(215) 246-2200 (T)
(215) 246-2211 (F)

**FREIWALD LAW, P.C.**

Dated: July 25, 2019

By: _____
AARON J. FREIWALD (I.D. No. 78028)
ZACHARY S. FEINBERG (I.D. No. 325297)
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
(215) 875-8000 (T)
(215) 875-8575 (F)

*Attorneys for Plaintiffs*